## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 30 2018, 9:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT B.L.B.

Michael B. Troemel
Lafayette, Indiana

ATTORNEY FOR APPELLANT D.S.

Cynthia Phillips Smith
Law Office of Cynthia P. Smith
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of C.S., B.L.B., and M.N. (Minor Children), Children in Need of Services:

B.N.B. (Mother) and
D.S. (Father),

*Appellants-Respondents,*

v.

Indiana Department of
Child Services,

*Appellee-Petitioner*

January 30, 2018

Court of Appeals Case No.
79A05-1708-JC-2020

Appeal from the Tippecanoe
Superior Court

The Honorable Faith A. Graham,
Judge

Trial Court Cause Nos.
79D03-1609-JC-281
79D03-1609-JC-282
79D03-1609-JC-283

**Baker, Judge.**

[1] B.N.B. (Mother) appeals the trial court's order modifying the dispositional decree after her three children were found to be children in need of services (CHINS); the trial court's modification order directed that the children be removed from Mother's care and custody. D.S. (Father) is the father of one of those three children; he appeals the same order with respect to his child. Both parents argue that the trial court erred by ordering that the children be removed from Mother's care and custody and Father argues that his child, C.S., should have been placed with him. Finding no error, we affirm.

## Facts

[2] C.S. was born to Mother and Father on June 23, 2016. Mother has two other minor children: B.L.B., born September 17, 2008, and M.N., born March 19, 2010.

[3] Between July 24 and September 29, 2016, the Department of Child Services (DCS) received allegations regarding three separate incidents of domestic violence between Mother and Father, all of which occurred in the presence of one or more of the children:

- Following an incident on July 24, both parents were injured, Father needed stitches, and both parents were arrested. Mother tested positive for an opioid medication for which she did not have a prescription.
- When law enforcement was again dispatched to the parents' home on September 17, they found an SUV in the driveway with all the doors open and an infant crying in a car seat. Mother exited the house with her arms full of clothes, saying she was moving out.
- When law enforcement was again called out to the home on September 29, Father had a laceration above his eye and was completely covered in

melted candle wax. Mother said Father had thrown her around and she had pain in her head. It was 9:43 a.m. and Father was intoxicated.

On November 18, 2016, the trial court found all three children to be CHINS and ordered that the children could remain in Mother's care and custody.[1] B.L.B. and M.N. were to have no contact whatsoever with Father, though the trial court later authorized Father to have fully supervised visits (away from Mother's home) with those children. On December 15, 2016, the trial court entered a dispositional decree. Among other things, the trial court ordered Mother and Father to: complete domestic violence and substance abuse assessments and comply with any recommendations; submit to random drug screens; and participate in individual and family therapy and comply with any recommendations.

[4] Over the ensuing months, the parents struggled to comply with court ordered services. They were both unsuccessfully discharged from home based case management in April 2017. In May 2017, Mother was unsuccessfully discharged from another service provider for case management and parenting education because of inconsistent communication. In June 2017, yet another service provider discharged the parents unsuccessfully because of a lack of communication.

---

[1] The parents did not appeal the CHINS adjudication.

[5] On June 9, 2017, DCS filed a rule to show cause because of the parents' failure to comply with court ordered services. Both parents had failed to consistently submit to random drug screens,[2] neither had provided a hair follicle drug screen, and both had been unsuccessfully discharged from multiple services. Even more troubling, Mother had been permitting Father to have unsupervised contact with the children. On June 19, 2017, DCS filed a motion to modify the placement of the children.

[6] The court appointed special advocate (CASA) requested that the children continue to be placed with Mother but noted that if Father continued to have unauthorized contact with the children, the CASA would support removal. In addition to the parents missing multiple visits and team meetings, the CASA noted that the older two children were amassing many unexcused absences at school. Mother admitted to the CASA that she was permitting Father to have unsupervised contact with the children. She was also permitting the children to stay with Father's sister and her boyfriend, who DCS had not approved as caregivers.

[7] On June 20, 2017, the trial court held a hearing on the rule to show cause and the motion to modify the dispositional decree. The trial court denied the request for change of placement and ordered DCS to ensure that three drop-ins

---

[2] Mother missed drug screens on 4/24, 4/27, 5/8, 5/16, 5/18, 5/19, 5/22, 5/25, 5/30, 6/2, 6/6, 6/8, and 6/12. Father missed drug screens on 4/24, 4/26, 4/27, 5/5, 5/9, 5/11, 5/17, 5/19, 5/22, 5/25, 5/30, 6/2, 6/6, 6/8, 6/13, and 6/14. Mother's App. Vol. III p. 21.

per day would occur at Mother's home. The trial court also found Mother in contempt, ordering that Mother serve three days in jail, which she did.

[8] On June 30, 2017, DCS filed a new motion to modify placement based on Mother's continued lack of engagement with services and unwillingness to make the children available for three daily drop-in visits. DCS set forth the following timeline of events after Mother was released from incarceration on Sunday, June 25, 2017:

- On Monday, June 26, Mother texted the family case manager (FCM) that she was taking B.L.B. to a CASA-approved church camp about 1.5 hours away. DCS dropped by Mother's home at 2:35 p.m., but she was not home. DCS later met up with Mother outside the home.

- On Tuesday, June 27, Mother texted the FCM, saying that B.L.B. had gotten sick at camp and she needed to go pick him up. She said that she would be home before 6:00 p.m. She was not home until 12:45 a.m., meaning that no drop-ins took place that day.

- On Wednesday, June 28, the FCM dropped by Mother's home and saw the children. Mother said she planned to take B.L.B. back to camp but the FCM said that because B.L.B. had not been symptom-free for twenty-four hours, she could not return the child. Mother told the CASA she was taking B.L.B. back to camp regardless of what DCS instructed. The FCM dropped in later that evening and noted that Mother was preparing to leave; the FCM again advised her that she was not authorized to take the children out of town. The FCM noticed that C.S. had bruising on his forehead, a laceration on the outer corner of his right eye, and scratches on his left cheek. The FCM directed Mother to take C.S. to the emergency room; Mother said that she would take B.L.B. back to camp and maternal grandmother would take C.S. to the hospital. The FCM again said that Mother was not authorized to take the children out of town. C.S. was eventually taken to the emergency room, where no internal injuries were found, and was released that night.

- On Thursday, June 29, DCS told Mother that she could travel out of the county for four hours only to return B.L.B. to camp. She left with the children at 12:35 p.m. but did not return until approximately 6:30 p.m.

DCS believed that Mother was avoiding and refusing to comply with the drop-in visits. Additionally, DCS was concerned about the injuries to C.S.'s head. After bringing its concerns to the trial court, the court authorized DCS to detain the children.

[9] On June 30, 2017, the FCM and a police officer went to Mother's home to detain the children. Mother "became increasingly angry and started shouting and not getting the children ready." Tr. p. 33. She refused to give C.S. to anybody, called the FCM a "bitch," and—in front of the children—questioned whether the children could trust the FCM. *Id.* at 33-34. Mother refused to help get the children's things together, so instead, seven-year-old M.N. helped the FCM gather their things. M.N. and B.L.B. were placed with their fathers and C.S. was placed with maternal grandmother. DCS elected not to place C.S. with Father because of his history of noncompliance with services and a history of unstable housing.

[10] The trial court held a hearing on DCS's motion to modify on July 5, 2017. Following the presentation of evidence, the trial court ruled from the bench:

> We are, what, 10 months into this case. We're only 10 Character Restorations in and zero Reflections in [both are domestic violence services] and that's the primary issue in this case. . . . Quite frankly, ma'am, you have been hovering on removal since day one because your attitude and your actions prevent DCS and service providers from ensuring the safety of the children. The

Court has given you opportunity after opportunity after opportunity to comply and to show that you can safely provide for these children. The Court went so far as to send you to jail rather than remove the children a few weeks ago in order for you to understand the importance of complying with the drop ins so that the Court would know these children are safe in your care. It appears to have made no dent in your thought process and your actions. The Court has no option but to remove these children from your care to ensure their safety.

\* \* \*

You have made it clear you are not going to listen to the Court's orders to protect the children. . . . You have thumbed your nose at the Court's order. . . . Mother's and [Father's] visits will be fully supervised at an agency, because they are currently living together according to [Father's] testimony.[3] The domestic violence issues have not been resolved, have not been addressed. When Mother . . . and Father . . . [have completed domestic violence services] the Court will consider whether or not the children can be returned to the care of both of them.

*Id.* at 141-42, 143. On July 31, 2017, the trial court entered a written order modifying the placement of the children. In relevant part, it found and concluded as follows:

Primary issues in this case involve domestic violence between the Mother and [Father]. Court adjudicated the children as CHINS

---

[3] In its original dispositional decree, the trial court had ordered that, "[p]rior to the Court considering the Mother and [Father] be back in the same home, Court, at a minimum would need to review the parents['] substance abuse assessments AND domestic violence assessments and follow all recommendations." Father's App. Vol. II p. 20 (emphasis original).

in October 2016 and Mother has yet to attend a [domestic violence treatment] class and [Father] has not yet completed [domestic violence services]. Mother and [Father] previously violated Court orders regarding [Father's] unsupervised contact with the children. Court gave parents another chance to follow orders, but Mother and [Father] continued to violate court orders resulting in contempt proceedings and Mother's incarceration. Even after incarceration, Mother demonstrated that she is unable or unwilling to follow Court orders to ensure the safety of the children. Due to the Mother's continued lack of compliance with drop ins, court is not able to ensure the safety of the children while in the care of the Mother at this time.

***

[Father] requests placement of his child, in his care. Court denies said request as [Father] has also violated the Court orders regarding unsupervised contact with the children.

C.S. Appealed Order p. 2-3. Mother now appeals the orders regarding all three children and Father appeals the order regarding C.S.

# Discussion and Decision

Both parents argue that the trial court erred by modifying the dispositional decree by removing the children from Mother's care and custody.[4] At the

---

[4] DCS argues that the orders from which the parents are appealing are not final, appealable orders. Placement decisions are continuing in nature, subject to change while the CHINS proceedings are pending, and do not make final determinations regarding placement of the child(ren). *See* Ind. Code § 31-34-21-2 (requiring CHINS court to review placement of children at least once every six months during a CHINS case). As such, DCS contends that the parents should have sought to file a discretionary interlocutory appeal pursuant to Indiana Appellate Rule 14(B). *Cf.* Ind. Appellate Rule 14.1 (giving DCS—not the parents—the right to seek an expedited appeal from certain orders in CHINS cases, including placement changes).

request of, among others, DCS or the parents, the trial court may modify a dispositional decree in a CHINS case. Ind. Code § 31-34-23-1. In entering a dispositional decree, the trial court must fashion an order that:

(1) is:

    (A) in the least restrictive (most family like) and most appropriate setting available; and

    (B) close to the parents' home, consistent with the best interest and special needs of the child;

(2) least interferes with family autonomy;

(3) is least disruptive of family life;

(4) imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; and

(5) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.

I.C. § 31-34-19-6; *see also* I.C. § 31-34-20-1(a)(3) (giving trial courts authority to remove a child who is a CHINS from the child's home). When reviewing a modification of a dispositional decree, we consider whether the evidence supports the trial court's findings of fact and whether those findings support the judgment. *In re T.S.*, 906 N.E.2d 801, 804 (Ind. 2009). We must give due regard to the trial court's opportunity to assess witness credibility and may not

---

Without deciding whether these orders were, in fact, final and appealable orders, we will review the parents' appeals given the importance of these issues to these children.

reweigh the evidence, considering only the evidence and inferences most favorable to the judgment. *Id.* We will reverse only if the order is clearly erroneous. *Id.*

[12] Mother argues that the trial court erred by basing its order on her transportation of the children to and from B.L.B.'s camp, given that B.L.B. was ill and Mother remained in contact with the FCM during that time. It is apparent, however, that this was not the sole basis of the trial court's ruling. Among other things, the trial court emphasized the following issues: (1) Mother's failure to participate with court ordered services, particularly domestic violence treatment; (2) Mother's repeated decision to allow Father unauthorized, unsupervised access to the children in violation of court orders—indeed, Father testified that he and Mother were living together (with the children); and (3) Mother's failure to ensure the availability of the children for daily drop-in visits from DCS.

[13] Even if we give Mother the benefit of the doubt regarding the day on which she had to pick B.L.B. up from camp because of illness, DCS presented evidence that there were multiple other days when Mother's uncooperative behavior made it extremely difficult for the FCM to see the children in accordance with the court order. And Mother has no genuine defense to the undisputed facts that she was not participating in court ordered services and was giving Father unauthorized access to the children. Under these circumstances, we find that the trial court's determination that it could not ensure the safety of the children in Mother's care and custody was not clearly erroneous; consequently, we also

find that the trial court's order removing the children from Mother's care and custody was not clearly erroneous.

[14] With respect to Father, he argues that the trial court erred by relying on an alleged history of unstable housing when DCS presented no evidence at the hearing that, at that time, his housing was unstable or inappropriate. It is apparent, however, that the trial court also relied on (1) Father's failure to participate with court ordered services, particularly domestic violence treatment; (2) Father's repeated failures to comply with the order that he have no unsupervised access to B.L.B. and M.N.; and (3) Father's failure to comply with the court order that he and Mother were not permitted to live together with the children in the house until, at the least, they had each completed substance abuse and domestic violence treatment. Given this evidence, we find that the trial court's determination that it could not ensure C.S.'s safety in Father's care and custody was not clearly erroneous and that its decision to place C.S. with maternal grandmother was not clearly erroneous.

[15] The judgment of the trial court is affirmed.

Riley, J., and Brown, J., concur.